Marco A. MARQUEZ,
Plaintiff-Respondent-Cross-Appellant,

v.

MERCEDES-BENZ USA, LLC,
Defendant-Appellant-Cross-Respondent.†[151]

Supreme Court

*No. 2010AP826. Oral argument November 8,2011.
—Decided May 24, 2012.*

2012 WI 57

(Also reported in 815 N.W.2d 314.)

† Motion for reconsideration denied in per curiam issued
7/2/12 (2012 WI 74).

120

For the defendant-appellant-cross respondent briefs by *Patrick L. Wells, Thomas Armstrong* and *von Briesen & Roper, S.C.,* Milwaukee and oral argument by *Patrick L. Wells* and *Owen Thomas Armstrong, Jr.*

For the plaintiff-respondent-cross appellant there were briefs by *Timothy J. Aiken, Vincent P. Megna, Susan M. Grzeskowiak* and *Aiken & Scopture, S.C.,* Milwaukee and oral argument by *Vincent P. Megna* and *Timothy J. Aiken.*

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. Marco A. Marquez, the consumer, brought this action against Mercedes-Benz USA, LLC, alleging that his new car was a "lemon," as defined in Wis. Stat. § 218.0171(2) (2005–06);[1] that he requested a refund and provided Mercedes-Benz with the required notice and information; and that Mercedes-Benz failed to provide a refund within the 30–day statutory period as required by Wis. Stat. § 218.0171(2)(c).

¶ 2. The Lemon Law provides that "[i]f a new motor vehicle does not conform to an applicable express warranty"[2] and the nonconformity is not cured after a "reasonable attempt to repair," then the consumer may

---

[1] All subsequent references to the Wisconsin Statutes are to the 2005–06 version, unless otherwise indicated.

We will refer to Wis. Stat. § 218.0171 in its entirety as the "Lemon Law."

[2] Wis. Stat. § 218.0171(2)(a).

124

return the vehicle to the manufacturer and elect to receive either a comparable replacement vehicle or a refund.[3]

¶ 3. A manufacturer violates the Lemon Law if it fails to voluntarily provide a refund or replacement vehicle within 30 days after receipt of the consumer's demand.[4] The penalties a manufacturer incurs for failure to provide a refund to the consumer within the 30–day statutory period are costly. They include "twice the amount of any pecuniary loss, together with costs, disbursements and reasonable attorney fees, and any equitable relief the court determines appropriate."[5] The order for judgment in the present case awarded the consumer $117,285.06, (twice his pecuniary loss), $5,833.41 (prejudgment interest), $45,423.68 (statutory interest), $10,216.72 (statutory costs), $2,105.79 (litigation costs), and $301,707.00 (attorney fees).

¶ 4. In the present case, no one disputes that the vehicle at issue is a lemon under the Lemon Law. No one disputes that the consumer gave Mercedes-Benz proper notice and information to start the 30–day statutory period during which Mercedes-Benz was required to provide a refund.[6] No one disputes that

---

[3] Wis. Stat. § 218.0171(2)(b).

[4] Wis. Stat. § 218.0171(2)(c) ("To receive a comparable new motor vehicle or a refund due under par.(b)1. or 2., a consumer described under sub.(1)(b)1., 2. or 3. shall offer to the manufacturer of the motor vehicle having the nonconformity to transfer title of that motor vehicle to that manufacturer. No later than 30 days after that offer, the manufacturer shall provide the consumer with the comparable new motor vehicle or refund . . . .").

[5] Wis. Stat. § 218.0171(7).

[6] The Department of Transportation is charged with putting the policies of the Lemon Law into practice. It produces a

Mercedes-Benz did not provide the required refund within the 30–day statutory period. The basic issue presented is whether Mercedes-Benz has a valid defense to its failure to issue a refund within the 30–day statutory period.

¶ 5. The specific issues presented are as follows:

¶ 6. I. To avoid paying the remedies provided by Wis. Stat. § 218.0171(7) for not issuing a refund within the 30–day statutory period, must a manufacturer prove that the consumer *intentionally* prevented it from providing a refund within the 30–day statutory period,[7] or may the manufacturer prove that the consumer's conduct was merely *unreasonable?*

¶ 7. II. Does the ordinary burden of proof or the middle burden of proof apply to a manufacturer's affirmative defense that the consumer intentionally prevented the manufacturer from providing a refund within the 30–day statutory period in a Lemon Law action?[8]

¶ 8. III. Did the circuit court err in directing a verdict in the consumer's favor?

---

Lemon Law notice form, which helps ensure that consumers comply with the requirements for making a proper request under the Lemon Law and that manufacturers have the information they need to assess the claim and provide a refund. *See* Stephen J. Nicks, *Lemon Law Practice Pointers,* Wis. Law., Nov. 2003, at 21, 22.

[7] We will use some form of the phrase "prevent the manufacturer from providing a refund within the 30–day statutory period" to encompass the various ways in which the intentional consumer conduct at issue was described and could be described (e.g., thwart, block, obstruct, undermine, etc.).

[8] Marquez raised this issue in his cross-appeal. It is the issue that was certified to this court by the court of appeals. Issues I, III, and IV were raised in Mercedes-Benz's appeal.

¶ 9. IV. Is Mercedes-Benz entitled to a new trial because the circuit court did not grant it an adjournment on the morning of trial to conduct additional discovery relating to the paralegal's testimony or because it was not allowed to call the consumer's counsel as a witness at trial?

¶ 10. For the reasons set forth, we decide the issues as follows:

> I. If a manufacturer raises the affirmative defense that the consumer prevented it from providing a refund within the 30–day statutory period under the Lemon Law, it must prove that the consumer did so intentionally.
>
> II. The manufacturer must meet the middle burden of proof in its affirmative defense that a consumer intentionally prevented it from providing a refund within the 30–day statutory period under the Lemon Law.
>
> III. No credible evidence supports the jury's verdict. The circuit court was not clearly wrong in directing the verdict in favor of the consumer.
>
> IV. The circuit court did not erroneously exercise its discretion in denying Mercedes-Benz's request for an adjournment on the morning of trial to conduct additional discovery relating to the paralegal's testimony or in denying Mercedes-Benz's request to call the consumer's attorney as a witness at trial.

¶ 11. Thus, we affirm the judgment and order of the circuit court.

¶ 12. We begin with a brief procedural history of the case. We shall then discuss each issue in turn, setting forth the standard of review and the applicable facts relating to that issue. Because the facts and evidence relate predominantly to the last two issues, most of the facts are set forth in our discussion of these latter two issues.

127

¶ 13. This case originated in the Circuit Court for Waukesha County, Paul F. Reilly, Judge. The circuit court granted summary judgment in favor of the consumer. Mercedes-Benz appealed, alleging that the consumer intentionally thwarted its attempt to provide a refund within the 30–day statutory period by failing to provide necessary information. The court of appeals reversed the summary judgment in favor of the consumer and remanded the matter to the circuit court. It held that a consumer who intentionally thwarts a manufacturer's efforts to provide a refund within the 30–day statutory period cannot recover the Lemon Law's statutory remedies provided in Wis. Stat. § 218.0171(7). The court of appeals further concluded that genuine issues of material fact existed regarding whether the consumer intentionally thwarted Mercedes-Benz's attempt to provide a refund within the 30–day statutory period by failing to provide necessary information. *Marquez v. Mercedes-Benz USA, LLC (Marquez I)*, 2008 WI App 70, ¶ 3, 312 Wis. 2d 210, 751 N.W.2d 859.

¶ 14. On remand in the Circuit Court for Waukesha County, Michael A. Bohren, Judge, the jury found in favor of Mercedes-Benz after a three-day trial. The circuit court entered a directed verdict in favor of the consumer, finding no credible evidence that the consumer intentionally thwarted Mercedes-Benz's efforts to provide a refund. Mercedes-Benz appealed, and the court of appeals certified the appeal to this court.

I

¶ 15. The first issue is whether a manufacturer who raises the affirmative defense that the consumer prevented it from providing a refund within the 30–day statutory period must prove that the consumer did so

intentionally. Determining the elements of a defense, here the *mens rea,* is a question of law that this court decides independently of the court of appeals and circuit court but benefiting from their analyses.[9]

¶ 16. The text of the Wisconsin Lemon Law does not refer to either party's obligation to act in good faith or to refrain from acting in bad faith, and does not refer to the consumer's preventing the manufacturer from providing a refund within the 30–day statutory period.

¶ 17. The court of appeals, however, has introduced the concept of good faith into the Lemon Law, noting that "good faith is implicit in the Lemon Law" and "[i]t should go without saying that the legislature contemplated that all the parties covered by the Lemon Law should act in good faith." *Herzberg v. Ford Motor Co.,* 2001 WI App 65, ¶ 18, 242 Wis. 2d 316, 626 N.W.2d 67.[10]

¶ 18. In *Herzberg,* the manufacturer attempted to require the consumer to sign forms relating to the condition of the vehicle that was being returned. These forms are not required by the Lemon Law. The consumer refused to sign the forms, thereby rejecting the manufacturer's conditional refund offer. The court of appeals held that "the obligations of the consumer who has purchased a 'lemon' are limited to those set out in

---

[9] *Cf. State v. Smith,* 2005 WI 104, ¶ 13, 283 Wis. 2d 57, 699 N.W.2d 508 ("Because determination of the statutory elements of a crime is a question of law, our review is de novo.").

[10] The court of appeals discussed good and bad faith even though it had noted in *Chariton v. Saturn Corp.,* 2000 WI App 148, ¶ 5, 238 Wis. 2d 27, 615 N.W.2d 209, that "there are no excuses" for a manufacturer who violates the 30–day time period.

the Lemon Law,"[11] and that the court "cannot logically rule that the [consumer] engaged in bad faith by rejecting the offer" that asked more of the consumer than the Lemon Law requires.[12]

¶ 19. In *Marquez I,* the court of appeals discussed "good faith," "bad faith," and a consumer "intentionally thwarting" a manufacturer's attempt to make a refund. The court of appeals stressed that it was not invoking the "amorphous and far-reaching" contractual doctrine of good faith and fair dealing. "Good faith" under the Lemon Law is not grounded in common-law contract doctrines; "good faith" is inherent in the statute.[13] The court of appeals held "that a consumer fails to act in good faith when he or she intentionally prevents the manufacturer from complying with the statute."[14] Compliance with the statute requires the manufacturer to make the refund within the 30–day statutory period. The court of appeals declared that if the consumer "intentionally thwarted [the manufacturer's] attempt to make a refund by failing to provide necessary information . . . [T]he consumer is not entitled to the Lemon Law's statutory remedies."[15]

¶ 20. In addition, the court of appeals used the following language, all of which establishes that it was not creating a negligence-based defense for manufacturers: the consumer "intentionally prevented," the consumer "intentionally thwarted," the consumer "intentionally withheld," the consumer's "deliberate ob-

[11] *Herzberg v. Ford Motor Co.,* 2001 WI App 65, ¶ 17, 242 Wis. 2d 316, 626 N.W.2d 67.

[12] *Herzberg,* 242 Wis. 2d 316, ¶ 19.

[13] *See Marquez I,* 312 Wis. 2d 210, ¶ 18; *Herzberg,* 242 Wis. 2d 316, ¶ 18.

[14] *Marquez I,* 312 Wis. 2d 210, ¶ 22.

[15] *Id.,* ¶ 3.

struction," and the consumer's "deliberate refusal."[16] Under *Marquez I,* it is not sufficient for a manufacturer to prove that a consumer's careless, unreasonable, or unjustifiable conduct caused the manufacturer to violate the Lemon Law. Rather, the manufacturer must prove that the consumer intentionally prevented it from making a refund within the 30–day statutory period.

¶ 21. Mercedes-Benz asks this court to reexamine the holding of *Marquez I.*[17] Mercedes-Benz argues that the 30–day statutory period for providing the consumer with a refund should be tolled from the point at which the consumer unjustifiably and unreasonably fails to provide the manufacturer with the needed information, causing the manufacturer to be unable to make the refund until such time as the information is provided.[18] Furthermore, Mercedes-Benz seeks a negligence-type standard of unreasonable or unjustifiable conduct on the part of the consumer rather than the higher standard of intentional conduct.

¶ 22. The consumer, on the other hand, argues that the manufacturer's affirmative defense should be limited to a consumer's intentional conduct preventing

[16] *Id.,* ¶¶ 2, 3, 12, 20, 23.

[17] Mercedes-Benz first argued for a negligence-based defense when the case reached the court of appeals for the second time. The consumer does not argue that Mercedes-Benz forfeited its right to raise this issue on review. Both parties have briefed the issue and we address it.

[18] According to Mercedes-Benz, a consumer's conduct would be unreasonable when (1) the manufacturer cannot make a proper refund without the consumer's cooperation; (2) the consumer is informed of this fact; (3) the consumer fails to provide that cooperation in sufficient time to permit the manufacturer to make a timely refund; and (4) the consumer has no legitimate excuse for his or her failure.

the manufacturer from making a refund within the 30-day statutory period. According to the consumer, if a consumer's negligence were sufficient to bar recovery, manufacturers could "dupe" consumers by making onerous requests for information in the hope that the consumer would fail to return a phone call or provide the wrong information. Then, the consumer asserts, the manufacturer could deter the consumer from filing suit with a credible threat that a jury would believe that the consumer's negligence prevented the manufacturer from providing a refund within the 30-day statutory period.

■

¶ 23. We must determine whether the affirmative defense of a consumer's negligent conduct (as the manufacturer urges) or whether the affirmative defense of a consumer's intentional conduct (as the consumer urges) better achieves the purposes of the Lemon Law. " 'Wisconsin's Lemon Law is obviously remedial in nature. As such, we should construe the statute with a view towards the social problem which the legislature was addressing when enacting the law.' "[19]

¶ 24. Lemon laws began to appear in the early 1980s, and by 1993 all 50 states had adopted a lemon law.[20] Wisconsin's Lemon Law took effect in 1983.

---

[19] *Hughes v. Chrysler Motors Corp.,* 197 Wis. 2d 973, 983, 542 N.W.2d 148 (1996) (quoting *Hartlaub v. Coachmen Indus., Inc.,* 143 Wis. 2d 791, 801, 422 N.W.2d 869 (Ct. App. 1988)); *see also Hughes,* 197 Wis. 2d at 979 (holding that remedial statutes should be liberally construed to advance the remedy the legislature intended to provide).

[20] Clifford P. Block, Note, *Arkansas's New Motor Vehicle Quality Assurance Act—A Branch of Hope for Lemon Owners,* 16 U. Ark. Little Rock L.J. 493, 493–94 & n.2 (1994).

¶ 25. For most purchasers, not only is the vehicle a monumental purchase, but for many it is also a practical necessity. Before the adoption of lemon laws, existing remedies under state and federal law were inadequate to protect people who purchased lemons. Consumers of vehicles are particularly vulnerable if their purchase does not comport with the warranty. They understandably would balk at litigating warranty claims against an experienced and financially powerful manufacturer or dealership and at incurring the costs of any such litigation.[21] Frequently the consumer's only realistic option was repeated trips to the dealership for repairs.

¶ 26. Legislatures intended the lemon laws to ensure that purchasers stuck with lemons could promptly be put in approximately the same position they were in before purchasing the lemon and that they could reach this position without the hassle, expense, and risk of litigation. "Wisconsin's lemon law was created to be a self-enforcing consumer law that provides 'important rights to motor vehicle owners.' "[22] As the

---

[21] *See* Stephen J. Nicks, *Lemon Law II,* Wis. Bar Bull., July 1987, at 48:

> Automobile manufacturers include some of the largest and most powerful corporations in the world. The Legislature clearly recognized that it was necessary to make the potential recovery large enough to give vehicle owners the incentive to bring suit against them. These corporations not only have the wealth and will to exhaust an individual litigant, but also control vast amounts of technical expertise on the very mechanical aspects the consumer is challenging. Without the sweetener of double damages in a sufficient amount and reasonable attorneys' fees, few consumers would bring such actions.

[22] *Hughes,* 197 Wis. 2d at 982–83 (citing Memorandum from Bronson C. La Follette, Attorney General, to Members of the Legislature, Re: AB 434, Auto "Lemon Law" Changes, Oct. 14, 1985, Wis. Act 205).

court of appeals explained in its certification memorandum, the Lemon Law "was intended to encourage consumers to act as private attorneys general in pursuing claims and to provide attorneys with incentives to represent those consumers."

¶ 27. This court described the underlying purpose of lemon laws as protecting purchasers of defective vehicles who, without the protection of a statute, would have no recourse other than to bring their cars in repeatedly for repair:

> For the average person, the purchase of an automobile was one of the most important of all consumer purchases in terms of significance and price. However, for thousands of purchasers each year, this highly significant purchase became a virtual nightmare when the automobile refused to function properly, and the seller was unable, or unwilling to take action to remedy the situation.
>
> Prior to the enactment of lemon laws, the only kinds of remedial relief available to consumers were the statutory remedies of revocation of acceptance and breach of warranty under the Uniform Commercial Code. Federal remedies also existed through the Magnuson-Moss Warranty Act. These state and federal remedies, however, did not adequately protect the interests of consumers in a typical lemon vehicle claim. Purchasers of defective cars had no recourse other than to repeatedly bring their cars in for repairs.[23]

¶ 28. Wisconsin's Lemon Law has been praised as particularly attuned to the difficulty of adequately protecting vehicle purchasers.[24] Even among lemon laws, all of which are geared toward consumer protec-

---

[23] *See Hughes,* 197 Wis. 2d at 980–81 (citations omitted).

[24] *See* Joan Vogel, *Squeezing Consumers: Lemon Laws, Consumer Warranties, and a Proposal for Reform,* 1985 Ariz. St.

tion, Wisconsin's Lemon Law is particularly pro-consumer in a number of ways. At the time of its creation, no other lemon law allowed for double damages.[25] The Wisconsin Lemon Law also favors consumers by allowing victorious consumers to recover attorneys' fees and costs. Additionally, while some states' lemon laws expressly include affirmative defenses[26] or sanctions against consumers who bring claims in bad faith,[27] the Wisconsin Lemon Law includes neither.

¶ 29. The principle motivation for the exacting remedies in the Wisconsin Lemon Law, the court has explained, is not to punish the manufacturer because a lemon escaped from the plant.[28] Rather, the principle motivation for the remedies is "to provide an incentive to th[e] manufacturer to promptly return those unfortunate consumers back to where they thought they were when they first purchased that new automobile."[29]

¶ 30. The exacting statutory remedies demonstrate that the Wisconsin legislature has expressed a strong preference for the interests of a consumer who purchased a lemon over the interests of the manufac-

L.J. 589, 662–63; Julie A. Vergeront, Note, *A Sour Note: A Look at the Minnesota Lemon Law,* 68 Minn. L. Rev. 846, 879–80 (1984).

[25] *See* Vogel, *supra* note 24, at 662.

[26] *See, e.g.,* 815 Ill. Comp. Stat. 380/3(d) (2008).

[27] *See, e.g.,* Fla. Stat. § 681.106 (2010).

[28] *Hughes,* 197 Wis. 2d at 986–87.

[29] *Hughes,* 197 Wis. 2d at 987; *see also Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 23 (explaining the intent of the Lemon Law and quoting *Hughes* with approval); Vergeront, *supra* note 24, at 880 ("The lemon law attempts to encourage efficient and low cost settlement of disputes over defective automobiles by defining more clearly when a consumer is entitled to a refund or replacement. Only by raising the costs of ignoring these guidelines can the goals of the lemon law be realized.").

turer who produced the lemon. The Wisconsin legislature intended to provide a compelling incentive for manufacturers to cooperate with the demands of the purchasers.

¶ 31. When a consumer establishes that he or she is stuck with a lemon and provides notice and an offer of title to the manufacturer, the legislature intends the consumer to receive a refund or replacement promptly, without resorting to litigation. The Wisconsin Lemon Law squarely places the burden on the manufacturer to provide a refund within the 30–day statutory period. By imposing this burden on the manufacturer, by imposing a strict 30–day time limit, and by providing exacting statutory remedies for a violation, the legislature intended to encourage cooperation from manufacturers and to make the prospect of litigation unattractive to manufacturers.

¶ 32. No affirmative defenses for manufacturers are explicitly stated in the Lemon Law. Any affirmative defenses or potential "excuses" for a manufacturer make a consumer's recovery more uncertain and make litigation more likely and more time-consuming. Manufacturers are better equipped to manage uncertainty, delay, and expense surrounding Lemon Law claims and may even prefer uncertainty and delay. A timely remedy for the consumer is a critical component of the Lemon Law. Therefore, any affirmative defenses or "excuses" for a manufacturer should be narrow, in keeping with the statutory purposes of aiding the purchaser. If affirmative defenses or excuses proliferate or are easy to establish, the purpose of the Lemon Law will be undermined.[30]

---

[30] *Cf.* Vogel, *supra* note 24, at 664 ("Bad faith provisions mainly give manufacturers a club to wield against a consumer who tries to litigate a claim.").

¶ 33. We thus reject Mercedes-Benz's invitation to broaden the manufacturer's affirmative defense to encompass a consumer's unintentional conduct. Accordingly, we conclude that a manufacturer may avoid Lemon Law penalties for failing to provide a refund within the 30–day statutory period if it proves that the consumer intentionally prevented the manufacturer from providing a refund within the 30–day statutory period. *Marquez I* used the phrases "good faith" and "bad faith." It limited its definition of good faith to not intentionally preventing the manufacturer from complying with the 30–day statutory period or not intentionally thwarting its efforts to do so. Accordingly, we need not use the phrases "good faith" or "bad faith." We can avoid any confusion about the meaning of the phrases "good faith" and "bad faith" that may come from the use of these phrases in other contexts. In keeping with *Marquez I* and the jury instructions, we need address only whether the consumer intentionally prevented the manufacturer from providing a refund within the 30–day statutory period.

¶ 34. Our holding gives manufacturers an incentive to gather the information needed to provide refunds within the 30–day statutory period, but it does not unfairly place manufacturers at the mercy of consumers. We recognize that situations might arise in which a consumer does not intentionally prevent a manufacturer from complying with the 30–day statutory period but in which it is nevertheless impossible for a manufacturer to gather the necessary information to make a refund. For example, a consumer provides adequate notice to the manufacturer, thereby starting the 30–day period, but then falls into a coma or gets lost in the wilderness and the manufacturer, without

137

needed information from the consumer, cannot comply with the statutory refund requirements within 30 days. In such unlikely scenarios, a manufacturer might very well have to take creative steps to protect against the exacting penalties. The present case does not, however, pose a situation in which the manufacturer tried to comply with great diligence and unlikely events outside of its control or outside of the control of a consumer made the manufacturer's compliance impossible. We need not, and do not, address such scenario here.

## II

¶ 35. The second issue requires us to determine whether the lowest, ordinary burden of proof or the middle burden of proof applies to the manufacturer's affirmative defense described above. Determining the burden of proof is essentially a question of statutory interpretation, a question of law that this court decides independently of the court of appeals and circuit court but benefiting from their analyses.[31]

¶ 36. There are three burdens of proof. The highest burden of proof applies in criminal cases, where the state has the burden of convincing the jury beyond a

---

[31] *See Carlson & Erickson Builders, Inc., v. Lampert Yards, Inc.,* 190 Wis. 2d 650, 658, 529 N.W.2d 905 (1995) ("Determination of the appropriate burden of proof in this case presents a question of statutory interpretation, a question of law which this court determines independently of other courts, benefitting from their analyses."). *Cf. Herman & MacLean v. Huddleston,* 459 U.S. 375, 389 (1983) ("Where Congress has not prescribed the appropriate standard of proof and the Constitution does not dictate a particular standard, we must prescribe one.").

reasonable doubt of the defendant's guilt.[32] In certain civil cases, a middle burden of proof is used, which is commonly described as requiring "clear and convincing" evidence. To meet the middle burden in Wisconsin, a party must convince the jury to a reasonable certainty by evidence that is clear, satisfactory, and convincing.[33]

¶ 37. In most civil cases, the lowest, ordinary burden of proof applies, requiring what is commonly referred to as a "preponderance of the evidence." In Wisconsin, the jury must be satisfied to a reasonable certainty by the greater weight of the credible evidence."[34]

¶ 38. Because the text and history of the statute are silent on this specific question, the parties devote substantial energy to surveying cases in which the middle or lowest burden of proof applies and arguing about the extent to which these cases either are analogous to or diverge from the present case.[35]

---

[32] Wis JI—Criminal 140 (2000) ("The burden of establishing every fact necessary to constitute guilt is upon the State. Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty.").

[33] Wis JI—Civil 205 (2004) ("The burden is to convince you by evidence that is clear, satisfactory, and convincing, to a reasonable certainty, that 'yes' should be the answer to (that) (those) question(s).").

[34] Wis JI—Civil 200 (2003) ("Th[e] burden is to satisfy you by the greater weight of the credible evidence, to a reasonable certainty, that 'yes' should be your answer to the verdict questions.").

[35] The consumer, arguing for the middle burden of proof, points to (1) an affirmative defense of arson in the insurance context; (2) intentional bad faith in the insurance context; and (3) estoppel.

Mercedes-Benz, arguing for the lowest burden of proof, points to (1) general contractual duties of good faith; and

¶ 39. We do not find an examination of other cases arising in different contexts particularly enlightening. Our determination of the appropriate burden of proof is influenced by the purposes and policies of the statute rather than by abstract analogies.[36]

¶ 40. In *Carlson & Erickson Builders, Inc., v. Lampert Yards, Inc.,* 190 Wis. 2d 650, 529 N.W.2d 905 (1995), this court was asked to determine whether to apply the lowest or middle burden to private, civil antitrust actions for treble damages. The defendant urged the court to require the plaintiff to meet the middle burden because the defendant faced damages that clearly had a punitive element and because the alleged conduct could also expose the defendant to criminal penalties.[37] Despite the aptness of the defendant's analogies, the court determined that imposing the ordinary burden of proof on the plaintiff would appropriately further the legislative goal of encouraging plaintiffs' " 'vigorous private enforcement of antitrust laws.' "[38] Imposing a heightened burden of proof on the plaintiff, on the other hand, would "express[] a preference for the defendant's interests" and "impede the private litigant."[39]

¶ 41. Applying the teachings of *Carlson & Erickson,* we strive to interpret the Lemon Law to advance, rather than hinder, its purposes.

---

(2) actions for property damage caused by crime under Wis. Stat. § 895.446 (2009–10).

[36] *Carlson & Erickson,* 190 Wis. 2d at 661–62.

[37] *Id.* at 660–61.

[38] *Id.* at 664 (quoting *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745 (1977)).

[39] *Carlson & Erickson,* 190 Wis. 2d at 664.

¶ 42. This case is the mirror image of *Carlson &
Erickson*.[40] In that case, we held that requiring a
plaintiff-consumer to prove antitrust violations by a
heightened burden "would impede the private litigant
and might undermine the enforcement of the antitrust
laws by private litigants."[41] In the present case, we
address whether a defendant-manufacturer may prove
an affirmative defense by the lowest burden.

¶ 43. Imposing the lowest burden of proof on the
manufacturer would be contrary to the remedial,
consumer-friendly purpose of the Lemon Law. If the
manufacturer's affirmative defense were governed by the
ordinary burden, the parties would " 'share the risk of
error roughly in equal fashion.' "[42] Making it easier for
manufacturers to assert and prove the affirmative
defense makes it more tempting for manufacturers to
circumvent the 30–day requirement. The lowest burden
of proof would undermine the statute's purpose of
protecting consumers, encouraging manufacturers to
provide refunds within the 30–day statutory period,
and discouraging litigation.

██

¶ 44. Requiring manufacturers to prove the affir-
mative defense by the middle burden of proof expresses

---

[40] The circuit court relied on *Carlson & Erickson* to reach
the opposite result, namely that Mercedes-Benz had to meet
only the lowest burden in proving its affirmative defense. The
circuit court reasoned that *Carlson & Erickson* involved treble
damages and the ordinary burden was applied, so the ordinary
burden of proof should apply in this case involving double
damages. The circuit court did not expressly consider that
*Carlson & Erickson* addressed the burden of proof for a
plaintiff's claim and this case addresses the burden of proof for
a defendant's affirmative defense.

[41] *Carlson & Erickson,* 190 Wis. 2d at 664.

[42] *Id.* (quoting *Addington v. Texas,* 441 U.S. 418, 423 (1979).

a preference for the consumer's interests and acknowledges the imbalanced playing field on which Lemon Law disputes unfold. Although the prospect of resorting to litigation is unpleasant to a manufacturer, it is feasible. Litigation may be impossible for many consumers.[43]

¶ 45. Manufacturers might argue that our two holdings will allow savvy consumers to use the Lemon Law as a get-rich-quick scheme. We see no such risk. As this court observed in *Dieter v. Chrysler Corp.*, 2000 WI 45, ¶ 26, 234 Wis. 2d 670, 610 N.W.2d 832, the Lemon Law "is hardly fertile territory for fortune hunters." The road to double damages and attorneys' fees is an arduous one. A consumer must establish that his or her car is a lemon, which requires four or more failed repair attempts or 30 or more days of lost use. Remedies beyond a refund or a replacement are still not available unless the manufacturer fails to comply with the Lemon Law within the 30–day statutory period after receiving proper notice from the consumer. Our holdings today encourage manufacturers to use their resources, as the legislature intended, to respond diligently to Lemon Law claims by providing a refund or a replacement within the 30–day statutory period rather than search for excuses to avoid responding to consumers.

## III

¶ 46. We shift gears at this point and address the particular facts of the instant case to determine whether the circuit court erred in directing a verdict in the consumer's favor. The circuit court granted the

---

[43] Vogel, *supra* note 24, at 663 ("Unlike the consumer, the manufacturer is not so readily deterred by the costs of defending claims.").

consumer's post-verdict motion for a directed verdict, overturning the jury verdict in favor of Mercedes-Benz.

A

■

¶ 47. A motion for a directed verdict challenges the sufficiency of the evidence. A circuit court may grant the motion if the "court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party."[44] The court has stated that "[w]hen there is *any* credible evidence to support a jury's verdict, 'even though it be contradicted and the contradictory evidence be stronger and more convincing, nevertheless the verdict . . . must stand.' "[45]

■

¶ 48. An appellate court conducts the same search for credible evidence to sustain the jury's verdict.[46] Thus, the circuit court's decision to grant the consumer's motion for a directed verdict will be upheld if the appellate court agrees that there was no credible evidence to support the jury's verdict in favor of Mercedes-Benz.

■ ■

¶ 49. An appellate court should not "overturn a circuit court's decision to dismiss for insufficient evidence unless the record reveals that the circuit court

---

[44] Wis. Stat. § 805.14(1).

[45] *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 389–90, 541 N.W.2d 753 (1995) (citations omitted).

[46] *Id.* at 388, 398.

was 'clearly wrong.' "[47] A circuit court's decision to change the jury's answer is "clearly wrong" if the jury's verdict is supported by "any credible evidence."[48]

¶ 50. We conclude that no credible evidence was presented at trial that supported a finding of intentional conduct and that there was no credible evidence from which a jury reasonably could have inferred that the consumer acted intentionally.

¶ 51. Because we conclude that the circuit court did not err in finding that no credible evidence supports Mercedes-Benz's affirmative defense under the ordinary burden of proof, it necessarily follows that no credible evidence supported Mercedes-Benz's affirmative defense under the middle burden of proof. Stated another way, because the circuit court correctly found that Mercedes-Benz did not establish its affirmative defense by a mere preponderance of evidence, clearly Mercedes-Benz did not establish its affirmative defense by clear and convincing evidence. Therefore, although the circuit court mistakenly applied the lowest burden

---

[47] *Id.* at 389 (citing *Helmbrecht v. St. Paul Ins. Co.,* 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985); *see also Trogun v. Fruchtman,* 58 Wis. 2d 569, 585, 207 N.W.2d 297 (1973) (quoting *Slam v. Lake Superior Terminal & Transfer Ry. Co.,* 152 Wis. 426, 432, 140 N.W. 30 (1913)) (" '[W]hen the trial judge rules, either on motion for nonsuit, motion for a directed verdict, or motion to set aside the verdict, that there is or is not sufficient evidence upon a given question to take the case to the jury, the trial court has such superior advantages for judging of the weight of the testimony and its relevancy and effect that this court should not disturb the decision merely because, on a doubtful balancing of probabilities, the mind inclines slightly against the decision, but only when the mind is clearly convinced that the conclusion of the trial judge is wrong.' ").

[48] *Haase v. Badger Mining Corp.,* 2004 WI 97, ¶ 17, 274 Wis. 2d 143, 682 N.W.2d 389.

of proof to the affirmative defense instead of the middle burden of proof, remand is unnecessary.

B

¶ 52. A review of a directed verdict depends heavily on the facts of the particular case. The trial lasted three days. We search for credible evidence from which the jury may have reasonably inferred that the consumer or his attorney intentionally prevented Mercedes-Benz from providing a refund within the 30–day statutory period. We view the credible evidence and reasonable inferences therefrom in the light most favorable to Mercedes-Benz, the party against whom the motion for a directed verdict was made. We also explain why those facts are insufficient to support the inference that the consumer or his attorney intentionally prevented Mercedes-Benz from providing a refund within the 30–day statutory period.

¶ 53. On April 30, 2005, the consumer purchased a new 2005 Mercedes-Benz E320. He financed the purchase with a loan from Waukesha State Bank (the Bank). The consumer experienced various problems with the vehicle that were not satisfactorily resolved, and he decided to seek relief under the Lemon Law.[49]

¶ 54. The consumer retained Attorney Vincent P. Megna, a Lemon Law specialist at the law firm of Jastroch & LaBarge, S.C. On October 25, 2005, the consumer met with Attorney Megna, and Attorney Megna drafted a "Motor Vehicle Lemon Law Notice," which he sent to Mercedes-Benz that same day.

---

[49] The parties stipulated that there was at least one "non-conformity" that was not resolved after a "reasonable attempt to repair," making the vehicle a lemon. *See* Wis. Stat. § 281.0171(1)-(2).

¶ 55. The consumer had previously discussed the possibility of obtaining a replacement vehicle with Mercedes-Benz representatives, but in this notice, the consumer checked a box indicating he would like a refund, not a comparable new vehicle. The consumer provided the name of the bank that financed his vehicle and provided the loan account number. The notice stated, "By providing this information, I authorize the manufacturer to contact this financial institution for financing information needed to calculate a refund." The consumer attached a consumer note that included the terms of his loan and the name of his loan officer, John Gray.

¶ 56. The notice also stated that the consumer was represented by counsel and stated that "the manufacturer should communicate with the consumer only through Jastroch & LaBarge, S.C." It was signed by Attorney Megna.

¶ 57. Mercedes-Benz received the notice on October 28, 2005. That same day, Wade Messing, a Mercedes-Benz representative, contacted the consumer directly to discuss the possibility of the consumer exchanging his lemon for a different vehicle. The consumer testified that Messing also asked him to drop his suit and fire his attorney so that they could "fix this amongst men."

¶ 58. The special verdict question asked the jury only whether the consumer failed to act in good faith on November 28. As explained in the jury instructions, the jury was being asked whether, on November 28, the consumer intentionally prevented the manufacturer from making the refund within the 30–day period, which the manufacturer must do to comply with the Lemon Law. Conduct on dates earlier than November 28 may be relevant to the extent it allows the jury to draw reasonable inferences about conduct on Novem-

ber 28. We therefore examine the communications between Messing and the consumer on November 23 and between the consumer and the Bank on November 23. The directed verdict centers on three telephone calls Messing made on November 28: to the Bank, to the consumer, and to Attorney Megna.

¶ 59. Messing communicated with the consumer on November 23, 2005. During this conversation, the consumer explained that he was not interested in another vehicle and preferred a refund. Messing told the consumer that he would call again the "week of the 28th" to arrange the refund.[50]

¶ 60. Also on November 23, the consumer called the Bank and authorized John Gray to release to Mercedes-Benz any financial information it requested relevant to his Lemon Law claim. The consumer also authorized John Gray to release the information to his attorneys. That day, the consumer's attorneys requested the loan information from John Gray and John Gray provided it.

¶ 61. From the first notice through the communications on November 23, Mercedes-Benz was given full information upon which to fulfill its responsibilities under the Lemon Law. No credible evidence supports an inference that on or before November 23, the consumer intentionally prevented Mercedes-Benz from providing a refund within the 30–day statutory period.

¶ 62. According to the jury instruction, the consumer's cooperation was required to the extent that it was "necessary for the manufacturer to fulfill its obligations to provide a refund." By November 28, the

---

[50] On November 21, another Mercedes representative, Joe Tolfa, spoke with the consumer about replacement vehicles, but the parties focus primarily on the interactions between the consumer and Messing.

consumer had cooperated with and assisted Mercedes-Benz to allow Mercedes-Benz to provide a refund within the 30–day statutory period.

¶ 63. The special verdict question thus focuses on occurrences on November 28, the only date subsequent to November 23 on which Mercedes-Benz communicated with the consumer, the Bank, and the consumer's lawyer.

¶ 64. Monday, November 28 was the first day on which Messing attempted to obtain financial information from the Waukesha State Bank. (The information was needed to calculate how Mercedes-Benz would divide the refund between the consumer and the Bank.) It was the final day of the 30–day statutory period in which Mercedes-Benz could provide a timely refund to the consumer.[51]

¶ 65. On November 28, Messing spoke to a representative in the Bank's call center in the morning and was told that the information could not be released without the consumer's verbal authorization. Messing did not ask to speak to the consumer's loan officer, John Gray, the loan officer listed on documents in Mercedes-Benz's possession as the consumer's loan officer.

¶ 66. Messing's second call on November 28 was around noon to the consumer, who was driving to work. Messing testified that he told the consumer to provide authorization to the Bank and that the consumer told Messing he would do so and call Messing back later that day to confirm that the authorization had been provided. The consumer, on the other hand, testified that Messing did not ask him to contact the Bank, and that the consumer directed Messing to contact his attorney. The consumer and Messing agree that they did not speak again on November 28.

---

[51] The 30th day after the consumer's notice fell on a Sunday and the parties agree that Mercedes-Benz had until the next day.

¶ 67. Messing's third call on November 28 was at around 2:30 P.M. to the consumer's attorneys. Messing spoke to a paralegal, Nancy Haselwood. The paralegal's notes from the conversation state that Messing called on behalf of Mercedes-Benz and wanted to speak to Attorney Megna. The paralegal informed Messing that Attorney Megna was not available, offered to take a message, and also suggested that it would be best if he put any requests for Attorney Megna in a letter and fax it to the office. The notes indicate that Messing did not leave a message and said he would rather "chat" with Attorney Megna. The paralegal testified that Messing did not leave a phone number at which he could be reached.

¶ 68. Messing testified that the paralegal told him that he had to put any request to Attorney Megna in writing. Messing never wrote or faxed anything to Attorney Megna or attempted to call the consumer or Attorney Megna or the Bank again. Messing did not make any additional efforts to provide the consumer with a refund on the afternoon of November 28.

¶ 69. The complaint against Mercedes-Benz was signed by the consumer's counsel on November 28. The consumer's attorneys filed the complaint against Mercedes-Benz and the dealership, Concours Motors, Inc.,[52] on November 29.

## C

¶ 70. The only issue presented for the circuit court and this court is whether there was any credible evidence from which the jury could reasonably infer that on November 28 the consumer or his attorney

[52] The parties later stipulated that the consumer would drop his claims against the dealership and proceed only against Mercedes-Benz.

intentionally prevented Mercedes-Benz from complying with the statute by providing a refund to the consumer within the 30–day statutory period.

¶ 71. The jury was instructed that the consumer acted intentionally to prevent the manufacturer from complying with the Lemon Law if the consumer "had the *mental purpose to cause the result of his action* or was aware that such conduct was practically certain to cause the result of the action," namely preventing Mercedes-Benz from providing a refund within the 30–day statutory period.

¶ 72. The jury was instructed as follows:

A consumer has a duty to act in good faith in pursuing a Lemon Law refund. *A consumer fails to act in good faith when he or she intentionally prevents the manufacturer from complying with the statute.* If the consumer's cooperation is necessary for the manufacturer to . . . fulfill its obligations to provide a refund, the duty of good faith requires the consumer to give the necessary cooperation.

*The requirement that a party act intentionally means that the party had the mental purpose to cause the result of his action or was aware that such conduct was practically certain to cause the result of his action.*

You may determine intent directly or indirectly from all the facts in evidence. You may also consider any of the party's statements or conduct, which indicate state of mind (emphasis added).

¶ 73. The jury was asked a single special verdict question: "On November 28, 2005 did [the consumer] fail to act in good faith in his dealings with Mercedes-Benz?" A failure to act in good faith, for purposes of the Lemon Law, was explicitly defined by *Marquez I* and the jury instructions to mean the consumer "intentionally prevents the manufacturer from complying with the

150

statute."[53] Thus, the concept of good faith, in the context of the Lemon Law, "is not imported from contract law."[54] With two dissents, the jury answered "yes."

---

[53] *See Marquez I,* 312 Wis. 2d 210, ¶ 22.

The jury instructions explained that "[a] consumer fails to act in good faith when he or she *intentionally prevents* a manufacturer from complying with the statute" (emphasis added). The jury instruction further explained that "the requirement that a party act intentionally means that the party had the *mental purpose to cause the result of his action or was aware that such conduct is practically certain to cause the result of his action.*"

Thus, when the jury was asked whether the consumer failed to act in good faith on November 28, it was asked to determine whether, on November 28, the consumer *intentionally prevented* the manufacturer from complying with the Lemon Law. In other words, it was asked whether the consumer had the *mental purpose on November 28 to prevent Mercedes-Benz from providing a refund within the 30–day statutory period or was aware that his conduct was practically certain to cause the intended result that the manufacturer not make a refund within the 30–day statutory period.*

Contrary to the concurrence/dissent's assertions, *see, e.g.,* concurrence/dissent, ¶ 152, the special verdict question asking whether the consumer failed to act in good faith, the jury instructions defining a failure to act in good faith as the intentional prevention of the manufacturer's compliance with the statute, and Part III of this opinion are all consistent with the court of appeals' holding in *Marquez I* and our holding in Part I of this opinion. *See Marquez I,* 312 Wis. 2d 210, ¶ 22 ("We hold only that a consumer fails to act in good faith when he or she intentionally prevents the manufacturer from complying with the statute."). The concurrence/dissent's belief that this opinion inserts additional factual requirements that Mercedes-Benz should not have to prove is based on a misunderstanding of the meaning of "intentional," as we describe below. *See infra* ¶¶ 84–86.

[54] *Marquez I,* 312 Wis. 2d 210, ¶ 22.

¶ 74. To answer the question "yes," that on November 28 the consumer failed to act in good faith, and to adhere to the jury instructions defining good faith, the jury had to find that the consumer had the mental purpose on November 28 to prevent Mercedes-Benz from complying with the Lemon Law by making a refund within the 30–day statutory period or was aware that his conduct on November 28 was practically certain to cause this result. For the consumer to have the mental purpose or to be aware that his conduct on November 28 was practically certain to prevent Mercedes-Benz from complying with the statute, as the jury instruction commands, the jury had to find that the consumer knew that November 28 was the last day upon which Mercedes-Benz could act. If the consumer was unaware that November 28 was the final day of the 30–day statutory period, the jury could not reasonably infer from the consumer's conduct on November 28 that the consumer intended—had the mental purpose—to prevent Mercedes-Benz from making a timely refund within the 30–day statutory period.[55]

¶ 75. The parties appear to agree that the jury had to conclude that the consumer knew that Novem-

---

[55] The concurrence/dissent argues that the jury did not need to find that the consumer knew that November 28 was the final day in order to conclude that the consumer intentionally prevented the manufacturer from complying. *See, e.g.,* concurrence/ dissent, ¶¶ 149–151. We disagree with the dissent. If the consumer was unaware that November 28 was the final day, the jury could not reasonably infer from the consumer's failure to return a phone call on November 28 that the consumer had the mental purpose of preventing the manufacturer from complying with the Lemon Law within the 30–day statutory period or knew that his conduct was practically certain to cause that result.

152

ber 28 was the final day for a refund.[56] Mercedes-Benz argues that the jury could properly infer from the evidence that the consumer knew that November 28 was the date Mercedes-Benz was required to make the refund. Mercedes-Benz argues that a jury could reasonably infer that the consumer had this knowledge because the consumer's attorney would have informed the consumer when his refund was due and would have informed the consumer about the potential financial benefit if Mercedes-Benz failed to make a refund within the 30–day period, and because it is "*undisputed* that [the consumer] offered no reasonable justification for not immediately providing Messing" with information on November 28.[57] Mercedes-Benz also urges that a jury could infer from the evidence that the consumer's failure to inform Mercedes-Benz that the needed infor-

---

[56] The concurrence/dissent takes issue with this statement that Mercedes-Benz agrees that the jury needed to find that the consumer knew November 28 was the final day. Concurrence/dissent, ¶ 159. One of Mercedes-Benz's arguments was that it could prevail merely by proving that the consumer acted unreasonably. Under that lower bar, which we rejected in Part I of this opinion, Mercedes-Benz believed that it was not necessary for the jury to infer that the consumer knew November 28 was the final day.

However, Mercedes-Benz accepts that if it was required to prove that the consumer intentionally prevented it from complying, then the jury had to have inferred that the consumer knew November 28 was the final day in which to make a refund under the statute. *See* Brief and Appendix of Defendant-Appellant-Cross-Respondent Mercedes-Benz USA, LLC at 10–11, 32, 34–36.

[57] Brief and Appendix of Defendant-Appellant-Cross-Respondent Mercedes-Benz USA, LLC at 28, 29. The consumer did explain his conduct, and the reasonableness of his conduct was disputed.

mation was available from John Gray or from the consumer's attorneys, as well as the consumer's failure to call Messing back, was intended to prevent Mercedes-Benz from complying with the statute within the 30–day statutory period.

¶ 76. Declaring it a close case and viewing the evidence "most favorable to the verdict and most favorable to Mercedes-Benz," the circuit court concluded that there was no credible evidence from which to establish that the consumer was aware that November 28, 2005 was the date Mercedes-Benz was required to make the refund and that absent such evidence or inferences, the jury could not reasonably find that the consumer intended to prevent Mercedes-Benz from complying with the Lemon Law by providing a refund within the 30–day statutory period.

¶ 77. The circuit court found "a gap" between the facts presented and the inferences that Mercedes-Benz argues the jury drew, "that is, that there was . . . knowledge, intent on the part of the [consumer] through his attorney to subvert the system and to thwart Mercedes-Benz."

¶ 78. Although a jury is allowed to draw reasonable inferences and determine intent "indirectly," the circuit court determined that the facts presented did not support the inferences drawn by Mercedes-Benz and the jury that the consumer intentionally prevented Mercedes-Benz from complying with the 30–day statutory period.

¶ 79. The circuit court explained that there was no evidence of "communications or environment" between the consumer and Attorney Megna demonstrating "the decision to intentionally thwart Mercedes. That evidence is lacking in the case." The circuit court reasoned that had Messing told Attorney Megna's office

154

that he needed the payoff numbers in a few hours, that would have presented a different case. The circuit court emphasized that Messing failed to state any urgency in any of his November 28 conversations. To the circuit court, "[t]hat's the gap."

¶ 80. This gap, declared the circuit court, "removes the foundation or the underlying premises permitting the jury to make the claim that—or draw the conclusions or inferences that Mercedes-Benz contends that they should and that perhaps they did and . . . that this was a deal between the attorney and client to obstruct and thwart . . . that there was a concept in [the consumer's] mind and in [Attorney] Megna's mind that we are going to drag this out and get past the 30–day limit, lay in the weeds, hide in the water, whatever it is, and not participate with the intent to undermine Mercedes effort to comply with the law."

¶ 81. According to the circuit court, a "nexus did not exist for a reasonable jury to draw the conclusion, to draw the reasonable inference that [the consumer]/ attorney intentionally thwarted and intentionally prevented [Mercedes-Benz] from complying with the law."

¶ 82. The circuit court observed that no reasonable inference regarding the consumer's or attorney's intent to prevent Mercedes-Benz from providing a refund within the 30–day statutory period could be drawn from the responses of the consumer or Attorney Megna's paralegal on November 28 or from the consumer's failure on November 28 to call Messing or to call the Bank. The consumer was working that day, had already communicated his authorization to the Bank, and had given information about the bank loan and loan officer to Mercedes-Benz in the written notice that Mercedes-Benz had received.

155

¶ 83. After reviewing the record in the light most favorable to Mercedes-Benz, we conclude, as did the circuit court, that there is no credible evidence from which reasonable inferences can be drawn to support Mercedes-Benz's affirmative defense. Thus, the circuit court was not "clearly wrong."

¶ 84. The concurrence/dissent asserts that "[a]ll that was needed was a jury finding that Marquez intentionally did not call the bank and that without his call, he knew that Mercedes-Benz could not make a refund *that day.*" Concurrence/dissent, ¶ 154. The concurrence/dissent misunderstands the legal significance of the word "intentional." "[Intentional conduct] is one of the most basic, organizing concepts of legal thinking. 'Intent' is also one of the most often misunderstood legal concepts."[58]

¶ 85. Even if the consumer "intentionally" did not call the bank in the sense that his conduct was volitional, the voluntary act or the failure to act does not amount to intentional conduct in a legal sense. In understanding the legal concept of intentional conduct, "[a]n act is to be distinguished from its consequences."[59] Intentional conduct means the actor intends the consequences.

¶ 86. "The three most basic elements of th[e] most common usage of 'intent' are that (1) it is a *state of mind* (2) about *consequences* of an act (or omission) and not about the act itself, and (3) it extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or

---

[58] Dan B. Dobbs et al., *Prosser and Keeton on Torts* § 8, at 33 (5th ed. 1984).

[59] *Id.,* § 8, at 34.

knowledge) that given consequences are substantially certain to result from the act."[60]

¶ 87. Unless the consumer knew that November 28 was the final day on which Mercedes-Benz could comply with the statute, the jury could not reasonably conclude that the consumer's failure to return a phone call amounts to intentionally preventing the manufacturer from complying with the statute.

¶ 88. No evidence in the record supports a reasonable inference that the consumer knew, either from counsel or from Messing, that November 28 was the last day for a refund. Mercedes-Benz fills this gap with speculation that the consumer knew the significance of the date and the urgency of Messing's request for information. The jury would be speculating about what information passed between counsel and client, and Messing gave no clue to the consumer that November 28 had any special significance.

¶ 89. With regard to the consumer's attorney, the only call Messing ever made to Attorney Megna was on the afternoon of November 28. The undisputed evidence was that Messing did not leave his telephone number for a return call, Messing did not write or fax Attorney Megna requesting the needed information, and Messing expressed no urgency. Attorney Megna did not return a 2:30 P.M. phone call by the end of the business day when the message had no return number and was simply a request "to chat." The evidence is undisputed that one of the consumer's lawyers signed a

---

[60] *Id.* Prosser and Keeton's definition of "intentional" is drawn from the Restatement (Second) of Torts. Wisconsin's criminal statutes define "intentionally" as follows: " 'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(3).

Lemon Law complaint by the consumer against Mercedes-Benz on November 28.

¶ 90. Viewing the telephone call of November 28 to Attorney Megna in the context of the other evidence and in the light most favorable to Mercedes-Benz, we conclude that the conduct of Attorney Megna on November 28 does not support a reasonable inference that Attorney Megna intentionally prevented Mercedes-Benz from complying with the Lemon Law by issuing a refund within the 30–day statutory period. It would require unsubstantiated speculation by the jury to infer from such seemingly innocuous conduct that Megna had a devious plan.

¶ 91. The evidence viewed as a whole in a light favorable to Mercedes-Benz does not support a reasonable inference that on November 28 the consumer failed to act in good faith by intentionally preventing Mercedes-Benz from complying with the Lemon Law by intentionally preventing Mercedes-Benz from making the refund within the 30–day statutory period.

¶ 92. For the reasons set forth, we conclude that the circuit court was not "clearly wrong" in determining that there was no credible evidence to support the jury's answer to the special verdict question. We conclude, as did the circuit court, that the jury's verdict impermissibly rests on "conjecture and speculation."[61]

¶ 93. We further point out that the jury could not have considered evidence that was not admissible to find intentional conduct on the part of the consumer. '

¶ 94. First, the jury might have been aware that the consumer stood to receive double damages and

[61] *See Foseid v. State Bank of Cross Plains,* 197 Wis. 2d 772, 791, 541 N.W.2d 203 (Ct. App. 1995) (quoting *Herbst v. Wuennenberg,* 83 Wis. 2d 768, 774, 266 N.W.2d 391 (1978)).

Attorney Megna stood to recover substantial attorneys' fees if Mercedes-Benz failed to comply with the 30–day deadline. However, prior to trial, the circuit court "preclude[d] . . . discussion or presentation of the statutory damage formula" because there was no "hint as to the connection between . . . double damages and allegations of bad faith." Absent some direct evidence of intent, the circuit court declined to allow the jury "to speculate what the plaintiff's position was" based on the statutory remedies that were available.

¶ 95. Second, the jury might have been aware that Attorney Megna was an experienced, successful Lemon Law specialist and might have inferred intent based on his history of winning Lemon Law suits. Again, this inference was prohibited by the circuit court before trial. The court proclaimed that "how the attorney practices . . . is not probative of issues in the lawsuit. . . . There are attorneys that focus on Lemon Law litigation. . . . That type of testimony and that type of historical background is not apparently probative in this case."

¶ 96. Third, the jury might have inferred intent from the fact that the complaint was dated November 28, the final day of the 30–day statutory refund period, and was filed the very next day. The complaint was signed by one of the consumer's counsel, not by the consumer. An inference about intent would be improper for two reasons.

¶ 97. That the complaint was dated November 28 cannot reasonably support an inference of intent. The consumer's or the attorneys' readiness and willingness to file a complaint immediately cannot support an inference that the consumer or attorney intentionally prevented Mercedes-Benz from providing a timely refund. As counsel for the consumer argued before trial, "the

159

plaintiff had a right and his lawyers had a right to file [the complaint] the minute that deadline was blown."

¶ 98. The filing of the complaint on November 29 cannot reasonably support an inference of intent. The circuit court ruled before trial that testimony regarding "communications or conduct that occurred . . . after November 28, 2005" was barred because it was not probative of the consumer's intent during the 30–day refund period. Thus, the filing of the complaint on November 29 was not properly considered by the jury.[62]

¶ 99. Fourth, perhaps the jury inferred the consumer's intent from evidence that the consumer initially entertained Mercedes-Benz's suggestion that he select a replacement vehicle before firmly requesting a refund on November 23. Allowing an inference that a consumer intentionally prevented the manufacturer from complying with the Lemon Law based on a consumer's negotiations would undermine the statute. The courts have held that manufacturers are required to comply with the 30–day refund period "regardless of the status of negotiations."[63]

¶ 100. The 30–day period is rigidly enforced even when a consumer's negotiations "undoubtedly compli-cate[] the process," despite the fact that it puts the manufacturer "in a difficult position with attendant risk."[64] The consumer could have negotiated up until the deadline without sacrificing his right to recover

---

[62] Counsel for the consumer objected to counsel for Mercedes-Benz referring to the November 29 filing in his closing statement; the objection was sustained.

[63] *Chariton,* 238 Wis. 2d at 32.

[64] *Church v. Chrysler Corp.,* 221 Wis. 2d 460, 468–69, 585 N.W.2d 685 (Ct. App. 1998).

statutory remedies. In fact, he ceased negotiations and made a clear request for a refund on November 23. The consumer's earlier negotiations cannot support a finding that the consumer, on November 28, intentionally prevented Mercedes-Benz from providing a refund within the 30–day statutory period.

¶ 101. The jury's finding that on November 28 the consumer intentionally prevented Mercedes-Benz from complying with the Lemon Law was impermissibly speculative. The record in the present case contains no credible evidence of any such intentional conduct by the consumer or his lawyer to bar a manufacturer from the Lemon Law's remedies. We agree with the circuit court that there was a gap between the facts presented and the jury's verdict.[65] The jury cannot fill that gap with speculative inferences.

## IV

¶ 102. Finally, we must address whether Mercedes-Benz is entitled to a new trial because either (1) it was not granted an adjournment on the morning of trial to collect non-privileged documents relating to the testimony of the paralegal, one of the consumer's witnesses; or (2) it was not permitted to call Attorney Megna as a witness.

¶ 103. For the circuit court's error to warrant reversal and a new trial, the error must be prejudicial. Wis. Stat. § 805.18 (2009–10).

¶ 104. With regard to each of these issues we set forth the standard of review, the relevant facts, and our decision.

---

[65] As explained above, the same result would necessarily follow if the appropriate middle burden had been applied to Mercedes's defense. Thus, remand is unnecessary despite the application of the incorrect burden.

(1)

■■■■

¶ 105. Whether to grant an adjournment is within the discretion of the circuit court.[66] We will set aside a circuit court's denial of an adjournment only if the circuit court erroneously exercised its discretion. An erroneous exercise of discretion exists " 'if the trial court failed to exercise its discretion or if there was no reasonable basis for its decision.' "[67]

¶ 106. Here are the facts relating to the adjournment and the testimony of the paralegal.

¶ 107. On July 27, 2006, Mercedes-Benz served a subpoena duces tecum on Jastroch & LaBarge, S.C., requesting access to any and all documents related to the matter at issue. The consumer moved to quash the subpoena on the ground that the requested materials were subject to the work product doctrine and the attorney-client privilege. The first circuit court granted the consumer's motion for a protective order foreclosing the deposition of Jastroch & LaBarge, S.C., the attorneys of record, and foreclosing discovery of documents in the law firm's possession that would be protected by the attorney-client privilege or the work product doctrine.[68]

---

[66] *Rechsteiner v. Hazelden,* 2008 WI 97, ¶ 92, 313 Wis. 2d 542, 753 N.W.2d 496 (citing *Robertson-Ryan & Assocs., Inc. v. Pohlhammer,* 112 Wis. 2d 583, 586–87, 334 N.W.2d 246 (1983)).

[67] *Rechsteiner,* 313 Wis. 2d 542, ¶ 92 (quoting *Robertson-Ryan,* 112 Wis. 2d at 587).

[68] During the hearing before the first circuit court, the circuit court stated that Mercedes-Benz could obtain more limited discovery from Attorney Megna without violating the work product doctrine or the attorney-client privilege. It suggested the possibility of a written interrogatory.

162

¶ 108. The case then proceeded as outlined above: the circuit court granted summary judgment in favor of the consumer, the court of appeals reversed and remanded for trial on the issue of the affirmative defense, and the case was tried before a different circuit court judge than the judge who quashed the subpoena.

¶ 109. The circuit court conducted a pretrial conference on October 27, 2008, and scheduled trial for March 17, 2009. On January 29, 2009, the consumer submitted a two-page affidavit of the paralegal, Nancy Haselwood, describing the November 28 conversation she had with Messing.

¶ 110. On the first morning of trial, the circuit court decided a number of motions in limine, including Mercedes-Benz's argument that allowing the consumer to call the paralegal to testify would constitute "trial by ambush" because Mercedes-Benz had not conducted discovery relevant to her testimony or deposed her.

¶ 111. The circuit court outlined the history of the litigation and found that Mercedes-Benz should have moved to reopen discovery at some point during the 11 months between the remand from the court of appeals and the first day of trial. The circuit court explained that the affidavit, which was provided more than one month before trial, provided notice to Mercedes-Benz of the limited content of her testimony. The circuit court also observed that the paralegal's testimony would not involve any privileged matters and that allowing her to testify would not conflict with the earlier circuit court's decision to quash Mercedes-Benz's subpoena. The circuit court determined that there was no surprise and that "trial by ambush" was "an overstatement and an exaggeration" of what had occurred.

¶ 112. Mercedes-Benz's brief argues that its hands were tied by the circuit court's initial decision to

163

quash its subpoena. We note, however, that the circuit court's order did not restrict all discovery. It quashed the overly broad subpoena. The circuit court advised Mercedes-Benz that there were other routes to get the non-privileged information and that it could have attempted to obtain more tailored discovery. Indeed the consumer offered documents before trial, which Mercedes-Benz refused.[69]

¶ 113. The circuit court's denial of Mercedes-Benz's request for an adjournment was not an erroneous exercise of discretion. The circuit court carefully considered the history of the litigation. It found that Mercedes-Benz had opportunities between the time when the case was remanded and the morning of trial to file a motion asking the court "to modify the scheduling order or pretrial order or to permit further discovery." The circuit court reasonably determined that an adjournment was not warranted on the basis of the facts on record. There was no erroneous exercise of discretion.

(2)

■■■■

¶ 114. The circuit court concluded that "there is not probative value to calling Attorney Megna or other

---

[69] Attorney Megna wrote a letter dated January 28, 2009, to Attorney Wells (counsel for Mercedes-Benz) offering to provide documents that related to the paralegal's testimony, but Attorney Wells declined the offer, declaring it to be self-serving and strategic. In response to Attorney Megna's motions in limine, Attorney Wells argued that Attorney Megna should either waive the attorney-client privilege and work product doctrine entirely or be precluded from presenting evidence that the consumer and Attorney Megna acted in good faith. In his reply to the defendant's response, Attorney Megna argued that there was no legal support for Attorney Wells's argument.

attorneys from the office of Jastroch & LaBarge relative to the merits of the issues in this case."

██ ██

¶ 115. With regard to the circuit court's ruling denying Mercedes-Benz permission to call Attorney Megna as a witness, the standard for review of this ruling is whether the circuit court erroneously exercised its discretion. "A circuit court has broad discretion in determining the relevance and admissibility of proffered evidence."[70] We will sustain this exercise of discretion if we conclude that "the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach."[71]

¶ 116. Counsel's arguments at the hearing on the day of trial on Mercedes-Benz's motion regarding Attorney Megna were very brief. Mercedes-Benz did not make a clear argument regarding the probative value of Attorney Megna's potential testimony. Instead, Mercedes-Benz argued that the first circuit court's protective order had prevented it from doing any discovery on Attorney Megna. The consumer appeared to argue that Attorney Megna's testimony about the November 28 telephone call is of no import because it is undisputed that Messing left no return number and indicated no urgency.

¶ 117. In its brief to this court, Mercedes-Benz argues that there was probative value to Attorney Megna's testimony regarding whether he actually received Messing's message on November 28 and whether

---

[70] *State v. Brecht,* 143 Wis. 2d 297, 320, 421 N.W.2d 96 (1988).

[71] *State v. Sullivan,* 216 Wis. 2d 768, 780–81, 576 N.W.2d 30 (1998).

he was actually too busy to return the phone call. Mercedes-Benz asserts that Attorney Megna's conduct is relevant to proving intentional obstruction. Mercedes-Benz reasons that if Attorney Megna was available on November 28 to talk with Messing but did not do so because the standard office procedure was to demand a faxed written request from the manufacturer, the jury could infer intentional obstruction from these facts coupled with Attorney Megna's knowledge that November 28 was the last day for the refund. Mercedes-Benz did not make this kind of statement about the potential probative value of Attorney Megna's testimony to the circuit court.

¶ 118. The consumer's brief argues that it was undisputed that Attorney Megna could not return the call because Messing left no return number; that Messing left no message with Attorney Megna's office seeking information about the consumer; and that Messing expressed no urgency that his call be returned and said that he merely sought to "chat."

¶ 119. The circuit court explained that the record reflected no "communications done pertinently between the attorney and Mercedes-Benz." Thus, the circuit court concluded that "that there is not probative value to calling Attorney Megna." With regard to Attorney Megna's conversations with the consumer, these conversations would be privileged.

¶ 120. Based on the arguments at trial, the circuit court's decision denying Mercedes-Benz request to call Attorney Megna as a witness was not an erroneous exercise of discretion. The circuit court examined the relevant facts and applied a proper standard of law, which was to assess whether Attorney Megna's testi-

mony would have probative value.[72] Considering that Mercedes-Benz did not present the circuit court with a clear argument why Attorney Megna's testimony would have probative value, we conclude that the circuit court's decision that Attorney Megna's testimony would not be probative because he had no conversations with the consumer or Mercedes-Benz on November 28 was one that a reasonable circuit court could reach.[73]

---

[72] *See* Wis. Stat. § 904.01 (2009–10) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

This court has noted that "[t]he determination of relevancy can never be an exact science because it necessarily involves the trial court's considered judgment whether a particular piece of evidence tends to establish a fact of consequence in a given set of circumstances. The issue of relevancy 'must be determined by the trial judge in view of his or her experience, judgment and knowledge of human motivation and conduct.' " *State v. Pharr*, 115 Wis. 2d 334, 344, 340 N.W.2d 498 (1983) (quoting *United States v. Williams*, 545 F.2d 47, 50 (8th Cir. 1976)).

[73] As we have explained, Mercedes-Benz made no specific argument to the circuit court on the morning of trial regarding the potential probative value of Attorney Megna's testimony. Although Mercedes-Benz argued that it could not make a proper offer of proof because it had been denied discovery regarding Attorney Megna, Mercedes-Benz could have provided a more thorough explanation to the circuit court of the potential probative value of Attorney Megna's testimony.

Regarding the importance of such offers of proof, Professor Daniel Blinka notes: "[T]he offer serves to educate the trial judge about what the evidence is, what it is being used to show, and why it is admissible under the rules of evidence. Trial judges have neither time nor opportunity to immerse themselves as deeply into a case as the trial lawyers who are responsible for presenting it. The offer, then, may provide the judge with the

■■■■■■■

■■■■■■■

\* \* \* \*

¶ 121. In conclusion, we hold that a manufacturer has an affirmative defense to avoid Lemon Law penalties if it proves that the consumer intentionally prevented the manufacturer from providing a refund within the 30–day statutory period. It is not sufficient to argue that a consumer was unreasonable or careless in responding to a manufacturer's requests for additional information. We also hold that a manufacturer must prove its affirmative defense by the middle burden of proof. Our first two holdings are strongly motivated by the purpose of the Lemon Law, which is to encourage manufacturers to provide prompt, hassle-free refunds to consumers whose vehicles turn out to be lemons. The imbalance of power between manufacturers and consumers makes consumers particularly vulnerable, and we interpret the Lemon Law in a manner that counteracts rather than exacerbates this legislative concern.

¶ 122. We uphold the circuit court's decision to grant the consumer's motion for a directed verdict. There was no credible evidence to support the jury's verdict, even under the ordinary burden of proof that was incorrectly applied at trial. We also hold that the circuit court did not erroneously exercise its discretion by denying Mercedes-Benz's request for an adjournment on the morning of trial or by denying Mercedes-Benz the opportunity to call Attorney Megna to testify.

¶ 123. For the reasons stated, we affirm the circuit court's judgment and order.

perspective and background necessary to make an informed decision on admissibility." Daniel D. Blinka, 7 *Wisconsin Practice Series: Wisconsin Evidence* § 103.4 (3d ed. 2008).

*By the Court.*—The judgment and order of the circuit court are affirmed.

¶ 124. PATIENCE DRAKE ROGGENSACK, J. (*concurring in part; dissenting in part*). I concur with the majority opinion's conclusion that it is the middle burden of proof that applies to Mercedes-Benz USA, LLC's affirmative defense that Marco A. Marquez did not act in good faith as Mercedes-Benz attempted to provide a statutory refund to him on November 28, 2005.[1] I also concur with the majority opinion's conclusion that the circuit court did not erroneously exercise its discretion in denying adjournment of the trial as Mercedes-Benz had requested.[2] However, I write in dissent because there is credible evidence to sustain the jury's finding that Marquez did not act in good faith in his dealings with Mercedes-Benz on November 28, 2005, which is the only question the jury was asked. Therefore, while I would have sustained the jury's verdict had the middle burden of proof been applied, because it was not, I would reverse the circuit court's decision and remand the matter for a new trial where the middle burden of proof would be applied to Mercedes-Benz's affirmative defense.

## I. BACKGROUND[3]

¶ 125. This case arises from Marquez's purchase of a new Mercedes-Benz E-series automobile that

---

[1] Majority op., ¶ 10.

[2] *Id.*

[3] The facts in this introductory narration are taken from the jury trial testimony of Wade Messing, the Mercedes-Benz representative who dealt with Marquez, on November 28, 2005, and from Marquez's complaint, signed by Marquez's attorneys on November 28, 2005.

turned out to be a lemon. When Mercedes-Benz could not fix the problems that the car exhibited, Marquez exercised his rights under Wis. Stat. § 218.0171, commonly known as Wisconsin's Lemon Law. He did so by retaining a lawyer, Vincent P. Megna, who sent Mercedes-Benz a document entitled "Motor Vehicle Lemon Law Notice" and "Demand for relief under s. 218.0171(2)(b)" that requested a statutory refund.

¶ 126. Mercedes-Benz received the notice on October 28, 2005. At that time, Mercedes-Benz had acknowledged that the E-series automobile could not be repaired to Marquez's satisfaction, and the sales representative was discussing Marquez's request to be provided another new Mercedes-Benz. As the conversations between the parties continued subsequent to October 28, 2005, Marquez decided that he did not want another E-series automobile. Instead, he asked to be placed in a 2007 S-series Mercedes-Benz. However, because the 2007 S-series automobiles had not yet been released to dealers, there would have been a wait of several months to get the vehicle he wanted.

¶ 127. Mercedes-Benz was willing to do as Marquez asked and obtain a 2007 S-series automobile for him, but on Wednesday, November 23, 2005, Marquez decided that due to the wait for a 2007 S-series vehicle, he preferred to obtain the statutory refund that he had requested in the October 28, 2005, notice his attorney sent. Wade Messing, the Mercedes-Benz representative who was handling this matter, testified that on November 23, 2005, Marquez told him that he had decided on a refund rather than another new Mercedes-Benz. Messing told Marquez that he would be back in touch to finalize payment.

¶ 128. November 23, 2005, was the Wednesday before Thanksgiving. Messing was out of the office on

Friday, November 24, for the Thanksgiving break, so he called Marquez in the morning on Monday, November 28, 2005. When Messing telephoned Marquez, Messing already had driven to Wisconsin from his Chicago office; retrieved Marquez's file from Concours Motors, Inc., the local dealership from which Marquez purchased his car; made arrangements with Concours Motors to cut checks on November 28 to both Marquez and the Waukesha State Bank, where Marquez had his car loan; and called the bank to attempt to learn what amount was due to it.

¶ 129. Messing testified that when he spoke with a representative of Waukesha State Bank to obtain the auto loan payout figure, the bank's loan department refused to give him the amount needed to pay off Marquez's loan on the E-series Mercedes-Benz. He said that he was told to have Marquez call the bank and authorize release of the necessary information.

¶ 130. Messing also testified that when he called Marquez, he told Marquez that the bank needed to hear from him because it had refused to provide Messing with the loan payout amount that Messing needed in order to finalize payments to the bank and to Marquez. Marquez said that he would contact the bank and call Messing back. However, Marquez did not call the bank to authorize it to release payout information to Messing and he did not call Messing back, as he promised that he would. Also, Marquez did not tell Messing that he had given John Gray, Marquez's loan officer at the bank, permission to release the payout figure for his auto loan.

¶ 131. Later in the day, when Messing had not heard from Marquez, he called Attorney Megna's office to ask Attorney Megna to call Marquez. Messing hoped that Attorney Megna would get Marquez to call the bank so Messing could get the information he needed. Attorney Megna was unavailable. The paralegal who took the

call did not tell Messing that Attorney Megna's office had the payout number from the bank, although she did note that Messing was calling on behalf of Mercedes-Benz. Instead, she told Messing that if he needed something from Attorney Megna, it was office policy that Messing put his request in writing.

¶ 132. November 28, 2005, was two business days after Marquez decided on November 23, 2005, to elect a refund rather than the replacement vehicle that he had been discussing with the dealer's sales representative. November 28, 2005, also was the last day on which Mercedes-Benz could fulfill its statutory 30–day obligation to pay the bank that held the loan and also pay Marquez the refund to which he was due.

¶ 133. November 28, 2005, was also the date on which Attorney Megna's office signed the summons and complaint that commenced this action. The complaint, which was trial exhibit A-2, alleges that Mercedes-Benz "failed or refused to provide the relief provided for by the Lemon Law."[4] Based on the alleged violation, Marquez requested "twice the amount of all pecuniary losses incurred heretofore or hereafter."[5] The complaint was prepared by Marquez's lawyers before Mercedes-Benz had failed to comply with its statutory obligation. The complaint was filed on November 29, 2005.

¶ 134. At the conclusion of the trial, the jury returned a verdict favorable to Mercedes-Benz. Marquez had moved for a directed verdict before the case was sent to the jury, and he renewed that motion after the jury verdict. In his motions after verdict, Marquez also requested that the circuit court change the answer to Special Verdict Question 1 from "yes" to "no." Special

---

[4] Complaint, ¶ 10.

[5] *Id.*, prayer for relief.

Verdict Question 1 stated: "On November 28, 2005, did Marco Marquez fail to act in good faith in his dealings with Mercedes-Benz?" The circuit court granted both of Marquez's motions after verdict and awarded him $482,661.66.[6] Mercedes-Benz appealed and the court of appeals certified the appeal.

## II. DISCUSSION

### A. Standard of Review

¶ 135. On appeal, we review the record to determine whether there is any credible evidence from which the jury could have answered "yes" when asked, "On November 28, 2005, did Marco Marquez fail to act in good faith in his dealings with Mercedes-Benz?" *See D'Huyvetter v. A.O. Smith Harvestore Prods.*, 164 Wis. 2d 306, 320, 475 N.W.2d 587 (Ct. App. 1991). Whether there is any credible evidence to support a jury's verdict is a question of law subject to our independent review; however, we benefit from the circuit court's discussion. *See State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

### B. Sufficiency of the Evidence

¶ 136. A motion for a directed verdict and a motion to change the answer to a question in a verdict test the sufficiency of the evidence to support the jury's verdict. *D'Huyvetter*, 164 Wis. 2d at 320; Wis. Stat. § 805.14(1) & (5)(c). The method for review of the sufficiency of evidence is set out in § 805.14(1):

Test of Sufficiency of Evidence. No motion challenging the sufficiency of the evidence as a matter of law to

---

[6] Final Judgment.

support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

¶ 137. Accordingly, when a jury is the trier of fact, its determination where facts are disputed is not to be set aside if there is any credible evidence to support the verdict.[7] *Millonig v. Bakken*, 112 Wis. 2d 445, 449, 334 N.W.2d 80 (1983); *Giese v. Montgomery Ward, Inc.*, 111 Wis. 2d 392, 408, 331 N.W.2d 585 (1983); *May v. Skelley Oil Co.*, 83 Wis. 2d 30, 35, 264 N.W.2d 574 (1978). Stated otherwise, a directed verdict may be granted only when the evidence is so clear and convincing that no reasonable jury could find for the nonmoving party. *Millonig*, 112 Wis. 2d at 451.

¶ 138. The credibility of witnesses and the weight to be given their testimony are the province of the jury, and when more than one reasonable inference may be drawn from the testimony, inferences that support the

---

[7] There are a few cases that opine that because a circuit court is better positioned to decide the weight and relevancy of testimony, we should give "substantial deference to the trial court's better ability to assess the evidence." *See, e.g., James v. Heintz*, 165 Wis. 2d 572, 577, 478 N.W.2d 31 (Ct. App. 1991); *Trogun v. Fruchtman*, 58 Wis. 2d 569, 585, 207 N.W.2d 297 (1973). However, those cases in the final analysis rely on the conclusion that there was credible evidence to support the nonmoving party's position, *see James*, 165 Wis. 2d at 577, or that there was not such credible evidence, *see Trogun*, 58 Wis. 2d at 589. They do not give the circuit court the option of dismissing a nonmoving party's case when there is any credible evidence to support it. Rather, "[a] great deal of credence is given to the jury's determinations." *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985).

jury's verdict must be sustained. *Roach v. Keane*, 73 Wis. 2d 524, 536, 243 N.W.2d 508 (1976). Furthermore, it is long settled law that a circuit court has no authority to change a jury's answer to a special verdict question:

> If there is any credible evidence which, under any reasonable view fairly admits of an inference that supports the jury's finding, the trial court has no authority to change the jury's answer. Only if the record is devoid of evidence that would sustain the verdict, or if the evidence were incredible, is it within the prerogative of the trial court to substitute its view of the evidence for that of the jury.

*Maichle v. Jonovic*, 69 Wis. 2d 622, 626, 230 N.W.2d 789 (1975) (citing *Lueck v. Janesville*, 57 Wis. 2d 254, 262, 204 N.W.2d 6 (1973); *Longville v. Leusman*, 48 Wis. 2d 251, 255, 179 N.W.2d 823 (1970); *Lehman v. Sentry Ins. Co.*, 35 Wis. 2d 96, 98, 150 N.W.2d 333 (1967)). Moreover, it is this court's duty to search for credible evidence to sustain the jury's verdict. *Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 450–51, 280 N.W.2d 156 (1979).

## C. Credible Evidence

¶ 139. In order to comply with its statutory obligations under Wis. Stat. § 218.0171, Mercedes-Benz had to provide a refund or a replacement vehicle, at Marquez's choice, within 30 days of its receipt of the Motor Vehicle Lemon Law Notice. Furthermore, because there was an outstanding loan, the loan also had to be paid off *with a separate check* to Waukesha State Bank within 30 days of Mercedes-Benz's receipt of Marquez's notice. *Marquez v. Mercedes-Benz USA, LLC*, 2008 WI App 70, ¶ 10, 312 Wis. 2d 210, 751 N.W.2d

859.[8] Giving Marquez a two-party check made out to him and to the bank would not have satisfied Mercedes-Benz's obligations under § 218.0171. *Id.*

¶ 140. The court of appeals explained that a person who purchases an automobile that turns out to be a lemon has a duty to act in good faith when the manufacturer attempts to provide a refund. *Id.*, ¶ 3 (concluding that if Marquez "intentionally thwarted [Mercedes-Benz's] attempt to make a refund by failing to provide necessary information about the consumer's auto loan," he did not act in good faith).

¶ 141. At trial, in accord with the court of appeals decision, Mercedes-Benz's affirmative defense was based on the assertion that on November 28, when it attempted to provide a refund to Marquez, Marquez did not act in good faith because he failed to call the bank so that Mercedes-Benz could access bank information that Mercedes-Benz needed to make the refund. Therefore, the testimony regarding Messing's attempts to obtain a payout figure on what Marquez owed to the bank on November 28, 2005, is critical to understanding the jury's verdict.

¶ 142. Messing explained what occurred during his attempts to determine what was needed to pay off Marquez's bank loan on November 28, 2005:

---

[8] This is the second time that the circuit court has declared that Marquez prevailed in his lawsuit against Mercedes-Benz. The first time around, the circuit court granted summary judgment to Marquez on his claim that Mercedes-Benz violated its obligations under Wisconsin's Lemon Law. The summary judgment was reversed by the court of appeals when the court concluded that there were material issues of fact in regard to whether Marquez proceeded in good faith in his dealings with Mercedes-Benz at the time of Mercedes-Benz's attempted payout. *Marquez v. Mercedes-Benz USA, LLC,* 2008 WI App 70, ¶ 24, 312 Wis. 2d 210, 751 N.W.2d 859.

Q. And when you contacted the bank, what did you tell the person that you spoke with?

A. I told the person—I identified myself as an employee of Mercedes-Benz USA and that one of their customers had an account with them, a bank loan on a Mercedes-Benz vehicle that had had some mechanical problems and that because of these mechanical problems Mercedes-Benz was being pro-active, wanted to get them out of the car and give him a refund of his money. I needed their financial payment information so I could calculate the refund that was due to them and to pay the loan off to the bank.

Q. .... Do you know in what department you—another person you were speaking with was employed?

A. Yes. They were in the loan department.

. . . .

Q. And the person you spoke with in the loan department, what were you told in response to your request?

A. I was told because of privacy laws they could not give me the financial information. That had to be released specifically by the owner of the account, Mr. Marquez, and I says, well, it was a time sensitive issue and I needed to get it done today. What's the quickest way I can get this done. That person indicated it would just be a phone call, have Mr. Marquez call us and give a verbal permission that a member of Mercedes-Benz yourself can get this information and we will be able to release to you.

Q. And armed with that information, what did you do?

177

A. At that point in time then I called Mr. Marquez, and had a discussion with him and let him know, hey, I'm up here trying to get your pay-off done, to give you your refund. I said I would give you a call back. Last piece of information I need is from the pay-off from the bank, but they will not release that information to me because of the privacy laws. I just need you to give the bank a call and verbally give them a call. They will release the information to me. That will be the last piece of puzzle that I need to get this done and he indicated he would give me a call back with the information.

. . . .

Q. Did he tell he was too busy working to help you?

A. No, he specifically stated he would call me back with the information.

. . . .

Q. Now, you asked him to contact the bank?

A. Yes, I did.

Q. Did he say he would not contact the bank?

A. No, he did not.

Q. Did he ever say the name John Gray to you?

A. He did not.

. . . .

Q. Did he say to you, my lawyers have a pay-off?

A. He did not.

. . . .

Q. So, the only thing he said was that he would call you back?

A. That he would call me back.

Q. And is that put in your notes anywhere?

A. Yes, it is.

Q. And so it's accurate, what exactly did you put in your notes that he said to you?

A. Client stated that he would call back that afternoon with the information, but he did not.

Q. What does that mean, "call back with the information?"

A. I interpreted that to mean he was going to call back, call the bank, I've let them know you need this, I've given them verbal permission for you to get the information.

Q. Did anyone from the bank contact you?

A. No.

Q. Did Marco Marquez ever call you back?

A. No, he did not.

. . . .

Q. Did you have any reason to believe that he would not follow through with his promise?

A. I did not.

Q. At some point I think your notes indicate you contacted the lawyer, is that right?

A. That is correct.

Q. And why did you contact the attorneys?

A. Well, my intent in contacting his attorney was to get a hold of the attorney who knows how impor-

tant it is that we get this done today and say please give your customer a call and say call me back, you need to call him because he needs to call the bank to give me the release permission so I can get the information on the bank.

. . . .

Q. A lot has been made of the fact that you didn't ask for a pay-off statement from the law firm. Why didn't you ask the law firm for their pay-off statement?

A. Because nobody indicated to me that they had it. Mr. Marquez in my conversation didn't say they had it, he didn't direct me to get it from them.

Q. You're accused of intentionally dragging your feet in this case. What does Mercedes-Benz have to gain to support these statements that you are intentionally dragging your feet?

A. We have absolutely at this point in time—we have absolutely nothing to gain and everything to lose at this point in time. We've already admitted I wanted to get the guy out of the car. I have nothing to battle about. I freely told him I was willing to get him out of that car. If I delay, drag my feet, it just is going to expose me to further penalties. So, I've got nothing to gain and everything to lose. . . .

Q. On November 28th, 2005 when you were at CM, did you stand ready to issue refund checks to Mr. Marquez and the bank had you had the pay-off statement?

A. Yes, I did.

Q. Had you been told that Mr. John Gray had apparently been pre-authorized to give this information to you would you have contacted Mr. Gray?

180

A. Yes, I would.

. . .

Q. Whose job was it if you couldn't get the bank to release the information to you without Mr. Marquez' authorization, whose job was it to authorize the bank to release it to you?

A. The only person that could authorize that release was Mr. Marquez as stated by the bank.

¶ 143. From the above testimony, the jury could have found that "On November 28, 2005, [] Marco Marquez fail[ed] to act in good faith in his dealings with Mercedes-Benz" by "failing to provide necessary information about [his] auto loan." *Marquez*, 312 Wis. 2d 210, ¶ 3.

¶ 144. Marquez knew that Messing had traveled to Wisconsin to make the requested Lemon Law refund to him; Marquez knew that Messing had called the bank and the person in the loan department with whom Messing spoke would not give Messing the information needed to pay off Marquez's car loan without Marquez's call; and Marquez knew that the payout figure from the bank was the last piece of information that Messing needed to complete the refund that Marquez had chosen on his Lemon Law claim. Notwithstanding having been told that the bank would not provide the necessary information without communication from him, Marquez did not cooperate with Mercedes-Benz's attempted refund. He never called the bank as he told Messing he would; he never called Messing back as he promised to do; he never told Messing that he had already authorized John Gray to release the payout information on his car loan; and he never said that his attorneys had a payout figure. Any one of these acts by Marquez would

181

have permitted Messing to cut the checks to the bank and to Marquez on November 28, 2005.

¶ 145. Mercedes-Benz satisfied the standard set by the court of appeals because Messing's testimony showed that Marquez "fail[ed] to provide necessary information about [his] auto loan." *Id.* However, contrary to the majority opinion herein, the jury was never asked to determine whether Mercedes-Benz had proved that Marquez knew that Wis. Stat. § 218.171 would be violated if Mercedes-Benz did not make a payout to him and to the bank on November 28, 2005.

¶ 146. The jury was instructed in relevant part:

> A consumer has a duty to act in good faith in pursuing a Lemon Law refund. A consumer fails to act in good faith when he or she intentionally prevents the manufacturer from complying with the statute. If the consumer's cooperation is necessary for the manufacturer to . . . fulfill its obligations to provide a refund, the duty of good faith requires the consumer to give the necessary cooperation.

> The requirement that a party act intentionally means that the party had the mental purpose to cause the result of his action or was aware that such conduct was practically certain to cause the result of his action.

> You may determine intent directly or indirectly from all the facts in evidence. You may also consider any of the party's statements or conduct, which indicate state of mind.

¶ 147. There is credible evidence that Marquez knew Messing was trying to provide a Lemon Law refund on November 28, 2005, because that is what Marquez requested on November 23, 2005. During their November 23 conversation, Messing said he would be back in touch to finalize payment. As described by

Messing's testimony, Marquez said that he would call the bank, but he failed to do so when he had been told that Mercedes-Benz could not get the necessary information about his auto loan without his call. There is credible evidence that Marquez had the mental purpose to thwart payment on November 28.[9]

¶ 148. Accordingly, under the jury instructions and in response to the special verdict question, "On November 28, 2005, did Marco Marquez fail to act in good faith in his dealings with Mercedes-Benz?," the jury answered "yes." Messing's testimony is credible evidence to support the jury's answer because Marquez did not provide necessary information about his auto loan. Therefore, the circuit court was clearly wrong when it set aside the jury's verdict. *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 389–90, 541 N.W.2d 753 (1995); *see also Millonig*, 112 Wis. 2d at 449 (concluding that when there is credible evidence to sustain a jury's verdict, it cannot be set aside); *Giese*, 111 Wis. 2d at 408 (same); *May*, 83 Wis. 2d at 35 (same); *Roach*, 73 Wis. 2d at 536 (same); *Maichle*, 69 Wis. 2d at 626 (same).

### D. Majority Opinion's Fundamental Error

¶ 149. The majority opinion is based on a fundamental error, and it is this error that then permits it to affirm the circuit court's change to the special verdict and the circuit court's grant of a directed verdict to Marquez. To explain, the jury was asked, "On November 28, 2005, did Marco Marquez fail to act in good faith in his dealings with Mercedes-Benz?" The jury an-

---

[9] The majority opinion emphasizes Marquez's view of the facts, *see, e.g.,* majority op., ¶¶ 55–57, 60–62, however, it is apparent that the jury rejected these facts by its answer to the special verdict.

swered, "yes," because Marquez promised he would call the bank and he did not make the call. Marquez's intentional failure to act prevented a Lemon Law payment on November 28, 2005, and Marquez had been told no payment could occur *that day* if he did not call the bank.[10]

¶ 150. The *jury never was asked* whether Marquez *knew* that November 28, 2005, was the last date on which Mercedes-Benz could make payment in compliance with Wisconsin's Lemon Law. Stated otherwise, the jury never was asked whether Marquez knew that Mercedes-Benz was required to "refund within the 30–day statutory period" provided by Wis. Stat. § 218.0171 and that November 28, 2005 was the 30th day, as the majority opinion repeatedly asserts.[11]

---

[10] I agree with the majority opinion's statement that conduct is intentional if it has the purpose to bring about intended consequences. Majority op., ¶ 86. However, the majority opinion misperceives the intended consequences that the jury found in this case. Here, the intended consequences were that no payout would occur on November 28, 2005. That Marquez's intentional conduct also occurred on the last day upon which Mercedes-Benz could make a payment without incurring Lemon Law penalties may well have been an unintended consequence of Marquez's denial of access to loan payout information. Not every consequence of an intentional act is an anticipated consequence. *See E-L Enters., Inc. v. Milwaukee Metro. Sewerage Dist.,* 2010 WI 58, ¶ 23, 326 Wis. 2d 82, 785 N.W.2d 409 (explaining that the removal of the groundwater was intentionally done, but the effect on the wood pilings was unexpected).

[11] The majority opinion repeatedly inserts the phrase "refund within the 30–day statutory period" into what it says the jury was asked to find. Majority op., ¶¶ 1, 4, 6-7, 10, 13, 15–16, 19–20, 22, 31, 33, 52, 61–62, 71, 74, 76, 82, 90–91, 100, 121. As I explain below, this insertion adds a fact to what the special

¶ 151. Furthermore, the jury instructions did not inform the jury that Marquez's conduct was not intentional unless it caused Mercedes-Benz to fail to make the "refund within the 30–day statutory period." There is no mention of the requirement of thwarting a "refund within the 30–day statutory period" in the jury instructions. A manufacturer can comply with the statute on any of the 30 days in which a refund is due, once a proper request for refund is made.

¶ 152. The majority opinion has added the factual requirement that Marquez had to know that November 28, 2005, was the last day of the "30–day statutory period." This is the fundamental error that underlies its reasoning. This added factual requirement changes the case that was tried and the question that the jury was asked to decide.

¶ 153. In addition, the majority opinion will effectively eliminate the affirmative defense raised in this case from subsequent Lemon Law cases. This is so because under the majority opinion's reasoning, no affirmative defense of thwarting a refund will lie unless the manufacturer can prove that the plaintiff had the requisite knowledge of the legal effect of his conduct on the statutory obligations that the Lemon Law places on the manufacturer. Most auto purchasers do not have law degrees and many do not consult a lawyer until just before a lawsuit is filed. The requisite knowledge of the manufacturer's statutory obligations will be absent for most Lemon Law plaintiffs and therefore, beyond proof at trial.

---

verdict and the jury instructions actually asked the jury to determine. However, I understand the majority opinion's need to insert this additional fact. It is the foundation that is necessary for the majority opinion to reach its conclusion.

¶ 154. Inserting "refund within the 30–day statutory period" may seem such a small addition to what the jury actually was asked to decide, but by inserting "refund within the 30–day statutory period" into its rationale, the majority assumes that the jury had to find two facts: (1) that Marquez intentionally did not provide necessary information about his auto loan; and (2) that Marquez also knew that if Mercedes-Benz did not make a refund on November 28, Mercedes-Benz would violate the Lemon Law, thereby entitling him to significant damages well beyond the price Marquez paid for his auto. However, knowledge of statutory requirements was not necessary for the jury to find that Marquez did not act in good faith on November 28. All that was needed was a jury finding that Marquez intentionally did not call the bank and that without his call, he knew that Mercedes-Benz could not make a refund *that day*.

¶ 155. The majority opinion's addition also adds a new requirement to the decision of the court of appeals that said that a lack of good faith is shown when, "the consumer intentionally thwart[s the manufacturer's] attempt to make a refund by failing to provide necessary information about the consumer's auto loan." *Marquez*, 312 Wis. 2d 210, ¶ 3. The court of appeals overturned a prior summary judgment because it concluded there was a material issue of fact about what the bank required in order to provide the loan information Mercedes-Benz needed to make a refund. *Id.*, ¶ 11 n.4 ("We conclude that on this record it is a question of fact whether and under what circumstances the bank would have released Marquez's loan information to MB.") There is nothing in the court of appeals opinion indicating that Mercedes-Benz was required to prove that

186

Marquez knew the legal effect of his conduct on Mercedes-Benz's legal obligations under the Lemon Law.

¶ 156. In addition, Marquez was required to act in good faith with regard to Mercedes-Benz as it attempted to make a Lemon Law refund, no matter whether it was the 30th day, the 29th day or some other day of the statutory 30–day period. The duty of good faith was not limited to the 30th day. As the court of appeals explained in its prior decision, "If MB stood ready to comply on the thirtieth day, and only Marquez's deliberate refusal to provide the necessary information prevented it from doing so, *we can see no reason why the fact that it was the thirtieth day should make any difference.*" *Id.,* ¶ 23 (emphasis added). Therefore, the breach of the duty of good faith was Marquez's deliberate refusal to call the bank to authorize Messing's access to the necessary information, which Marquez had been told would prevent a Lemon Law refund on November 28, 2005.

¶ 157. Notwithstanding the question that was presented to the jury, which the jury answered, the majority opinion asserts:

> To answer the question "yes," that on November 28 the consumer failed to act in good faith, and to adhere to the jury instructions defining good faith, the jury had to find that the consumer had the mental purpose on November 28 to prevent Mercedes-Benz from complying with the Lemon Law by making a *refund within the 30–day statutory period* or was aware that his conduct on November 28 was practically certain to cause this result. . . .[12]

> The parties appear to agree that the jury had to

---

[12] *Id.,* ¶ 74 (emphasis added).

conclude that the consumer knew that November 28 was the final day for a refund.[13]

¶ 158. The majority opinion's major premises are again fundamentally wrong in several respects. First, the jury was never asked whether "on November 28 the consumer intentionally prevented Mercedes-Benz from providing a "refund within the 30–day statutory period," as the majority opinion asserts. As I have explained above, there was no question put to the jury that required it to find that Marquez knew that November 28, 2005, was the last date on which Mercedes-Benz could make payment and comply with the 30–day statutory period for refunds under the Lemon Law. Marquez's failure to call the bank as he said he would prevented the refund on November 28, 2005, and he had been told that no payment could be made *that day* without his call. That is the issue that was before the jury.

¶ 159. Second, Mercedes-Benz does *not* "agree that the jury had to conclude that the consumer knew that November 28 was the final day for a refund," as the majority opinion also asserts. Mercedes-Benz repeatedly has explained that it was not necessary for it to prove Marquez's knowledge about the 30–day window in which to comply with the Lemon Law in order to prove that Marquez did not act in good faith on November 28, 2005.[14] Why would Mercedes-Benz "agree" to that fact? It would be agreeing to the existence of a fact that the jury was never asked to find.

¶ 160. In addition, requiring Mercedes-Benz to prove, after the trial is over, that Marquez knew that November 28, 2005, was the last day on which

[13] *Id.,* ¶ 75.

[14] Mercedes-Benz's brief, e.g., pp. 10, 23–24, 27–28.

188

Mercedes-Benz could meet its 30–day refund obligation under the Lemon Law, contravenes notions of fairness and ignores the fundamental fact-finding nature of the jury. Marquez made no such request at trial, and if that were a fact he believed Mercedes-Benz was required to prove, he should have requested a jury question on it. He also should have requested a jury instruction that said that preventing the manufacturer from complying with the statute meant that the consumer knew that November 28, 2005, was the last day on which the manufacturer could make a refund without incurring a penalty. He did neither. By slipping in the phrase, "refund within the 30–day statutory period," the majority opinion has constructed a question that the jury was never asked. Without that addition, the majority opinion has no basis upon which it can invalidate the finding of the jury.

## III. CONCLUSION

¶ 161. I concur with the majority opinion's conclusion that it is the middle burden of proof that applies to Mercedes-Benz's affirmative defense that Marquez did not act in good faith as Mercedes-Benz attempted to provide a statutory refund to him on November 28, 2005, and I also concur with the majority opinion's conclusion that the circuit court did not erroneously exercise its discretion in denying adjournment of the trial as Mercedes-Benz had requested. However, I write in dissent because there is credible evidence to sustain the jury's finding that Marquez did not act in good faith in his dealings with Mercedes-Benz on November 28, 2005, which is the only question the jury was asked. Therefore, while I would have sustained the jury's verdict had the middle burden of proof been applied, because it was not, I would reverse the circuit court's

decision and remand the matter for a new trial where the middle burden of proof would be applied to Mercedes-Benz's affirmative defense.

¶ 162. For the foregoing reasons, I concur in part and dissent in part.